(C. D. 619)

BRABENDER CORP. ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 22, 1942)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiffs.
*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on particular importations of so-called moisture testers, flour mills, extensographs, farinographs, amylographs, and plastographs, and parts thereof, imported from Germany. Duty was levied thereon at the rate of 40 per centum ad valorem under paragraph 360 of the Tariff Act of 1930 which reads as follows:

PAR. 360. Scientific and laboratory instruments, apparatus, utensils, appliances (including surveying and mathematical instruments), and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specially provided for, 40 per centum ad valorem; drawing instruments, and parts thereof, wholly or in chief value of metal, 45 per centum ad valorem: *Provided*, That all articles specified in this paragraph, when imported, shall have the name of the maker or purchaser and beneath the same the name of the country of origin die sunk conspicuously and indelibly on the outside, or if a jointed instrument on the outside when closed.

It is claimed that said articles are properly dutiable at the rate of 35 per centum ad valorem under paragraph 353 of said act as articles having as an essential feature an electrical element or device, or parts thereof, or at the rate of 27½ per centum ad valorem under paragraph 372 of said act as machines or parts thereof not specially provided for.

This case was originally decided by us on May 7, 1941, in *Brabender Corp. et al.* v. *United States*, C. D. 491, and is again before us a result of a rehearing granted the Government.

The articles are represented by the following exhibits which were admitted in evidence: Illus. exhibit A, moisture testers; illus. exhibits B–1 and B–2, flour mills; illus. exhibit C, extensographs; illus. exhibit

D, farinographs; illus. exhibit E, amylographs; and illus. exhibit F, plastographs.

In addition to the exhibits, the plaintiffs offered in evidence the testimony of Arthur Hartkopf, vice president, treasurer, and general manager of the plaintiff corporation, who testified that the various entries enumerated in the within protests cover the following merchandise and parts thereof.

| Protest No. | Entry No. | Merchandise |
|---|---|---|
| 6753–K | 852387 | Parts of Farinographs |
| | 737690 | " |
| 16148–K | 865885 | " |
| | 844529 | Two flour mills |
| 23703–K | 745922 | Parts of farinographs |
| | 802166 | Parts of amylographs |
| | 809739 | Parts of extensographs and parts of farinographs |
| 25240–K | 830751 | Moisture tester parts (Case #4 1st item of thermometers) |
| " | " | Amylograph parts (Case #4 special thermometers) |
| " | " | Moisture tester parts (Case #4 Relais) |
| " | " | " (Case #4 Transformers) |
| " | " | " (Case #5 Scale Lamps) |
| 2835–K | 843685 | " (2d page of invoice Indicator lamps) |
| " | 837542 | Plastographs and parts |
| " | 868431 | Parts of farinographs |
| " | 707778 | Moisture testers |

The witness then testified that he was thoroughly familiar with all the articles constituting the imported merchandise at bar; that the moisture testers (ill. ex. A) consisted of an oven and a balance containing an electric light, the whole being operated by the passage of an electric current; that he would call it an electric oven; that the so-called flour mills (ill. ex. B–1 and B–2) although operated after importation by American electric motors, could be operated by any other power simply by the installation of a small pulley; that the extensograph (ill. ex. C) contains two electric motors that were inside of the machine when imported; that the farinograph (ill. ex. D) also contained several electric motors inside of the machine when imported; that the amylograph (ill. ex. E) when imported did not contain any electric motors and that the machine was not an electrical instrument; that the plastograph (ill. ex. F) was similar in its construction to the farinograph (ill. ex. D); that each of the flour mills (ill. ex. B–1 and B–2) is fitted with a shaft connected with several grinding stones, which, on the turning of the shaft, grind wheat, rice, or other grain; that it also contains several sifters which move with the turning of the shaft; that these so-called flour mills are used to either predetermine or control the quality of the product in flour

mills; that the moisture testers are sold to different kinds of factories for the purpose of controlling the moisture of the product; that they are usually set up in the factory itself and not used in a laboratory; and that they did not require any special study for their operation and use.

At this juncture, interrogated as to the purpose and use of moisture testers in flour mills, the witness testified as follows:

* * * the research of free moisture in flour was completed many, many years ago. The fact has been brought out by that reason, many, many years ago, that a kernel of wheat will break down in value differently, whether it is red or black; a kernel of wheat will break down in the sort of powdery form when it is too dry. So the moisture content is of very great importance to obtain in the flour mill a sort of breakdown of wheat which will bring us the right kind of flour we want. * * * We cannot afford three shifts of chemists. He works from 8:00 to 5:00. During the other shifts they used to stack up so many for him the next day. Now the flour mills can have that moisture content whenever they want it with that moisture tester. The instrument was constructed for that purpose; this enables them to do that.

The witness further testified that so-called flour mills (ill. ex. B-1 and B-2) are sold to flour mills and are operated on a sample of wheat to determine what type of flour will result; that only a certain percentage of flour mills in the United States have laboratories; that illustrative exhibits B-1 and B-2 can be used anywhere; that the extensograph (ill. ex. C) is a machine for testing wheat flour in the baking of a loaf of bread; that in other words it determines the consistency of the dough made from a particular kind of wheat, the result being indicated on a chart by an automatically operated pen; that this machine is usually set up in the laboratory and operated by either the chemist or his assistant; that one of these instruments is used in the University of Minnesota and another in the Government laboratory in Ottawa, Canada; that the farinograph (ill. ex. D) is a machine for testing the mixing requirements and mixing resistance of flours; that the witness has seen these farinographs used by various baking and milling concerns; that they were used in the laboratory itself or in some room adjacent thereto; that there is nothing about the said machines that makes them adaptable to research; that the amylograph (ill. ex. E) takes a suspension of flour in water and keeps it at an automatic rate of increase to a point where the said suspension gelatinizes and offers a greater resistance and it measures during that entire process the viscosity or resistance of the material, the resulting curve of temperature and viscosity being automatically shown on a single chart; that the operation of this machine does not require any special knowledge; that the witness had seen about five of these machines in use in flour mills and bakeries; that their use was definitely a commercial one; that one of these machines was loaned to the University of Minnesota for trial use; that the plastograph (ill.

ex. F) operates the same as the farinograph (ill. ex. D) the only difference between the two being in the size; that the use, however, is very different, the plastograph being used for determining the plasticity of rubber compounds, paint pigments, highway building materials, as well as of flour dough; and that anyone can operate the plastograph, all that is required being to weigh the different materials, add water thereto, and turn on the power.

On cross-examination the witness testified in part as follows:

By Mr. FitzGibbon.

X Q. With the plastograph it is just like the farinograph?—A. Practically, yes.

X Q. It is also true it is used in the laboratory?—A. It could be used in the laboratory, yes.

X Q. Isn't it a fact that it is used in the laboratory?—A. Yes, sir.

X Q. Where are the others used?—A. In factories.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Now, the amylograph is also used in the laboratory, isn't it?—A. I say it could be.

X Q. Is it a fact that it would be?—A. Some are used in the laboratory, yes.

X Q. Where are the others used? In factories?—A. Yes.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. These are control instruments?—A. As a matter of fact, my card which I present reads, "Industrial Measuring and Control Apparatus."

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Merely during the process of production, when you take a sample from the product being produced, you can indicate by any of these machines the moisture content of it, or, in the case of the extensograph, you indicate the extension of the wheat germ?—A. We do.

X Q. And in the plastograph the extension or the elasticity of the earth, or whatever it is?—A. Yes.

X Q. So that that indicates those things to the factory or baker or flour mill?— A. Yes, sir.

X Q. Now your two mills—one mill has a capacity of possibly two or three pounds of wheat in 10 minutes?—A. Yes.

X Q. And the other, the smaller one, I presume in about two pounds in 20 minutes?—A. It wouldn't be practicable.

X Q. They are used to produce flour for the purpose of making tests on the flour?—A. Yes, sir.

X Q. They are used to produce flour so that the laboratory can determine from that flour certain things, are they not?—A. Yes, sir.

X Q. When you say "produced," they are using it in the laboratory of the flour mills?—A. Flour mills have manufactured flour for hundreds of years without ever hearing of the word "laboratory."

X Q. Flour mills have been operating hundreds of years without hearing of the words "farinograph" or "extensograph"?—A. Yes, sir.

X Q. Now, you say your moisture testers are used in other lines than for testing moisture in flour? You take a seller of tobacco, and he will run it through the moisture tester?—A. Frequently, in pieces.

X Q. If it is too high, then the operator of that tobacco factory knows he has to do something so that that moisture won't affect the rest of the tobacco?— A. Yes, sir.

X Q. The macaroni factory tests the moisture content of the macaroni, and if they find it too high they have to do something to control the moisture in the macaroni?—A. Right.

X Q. So they are merely, all of them, machines which test certain substances at certain times, and give particular results; is that right?—A. That is right.

In his affidavit accompanying his motion for rehearing, counsel for the Government contends that this court, in its original decision, misconstrued the evidence for the alleged reason that "both the moisture testers and the flour mills are used to produce results for laboratory technicians' use in research work, looking towards the production of better products." In our opinion the record does not support such contention. On page 22 of the record the witness Hartkopf testified as follows:

Q. Describe exactly what function they perform at the different mills where you have seen them in operation.—A. Moisture testers are used mostly in the mill itself, not used in the laboratory. In fact the instrument was made for the purpose of delivering into the hands of the superintendent the moisture control, which was formerly in the hands of the laboratory chemist. * * *

And on page 23:

Q. Will you please explain just exactly where in the factory these instruments, these moisture testers, are used?—A. In the flour mills, for instance, most of them are set up directly in the flour mills, and they are operated either by the head miller or his assistants, or the shift man—that is the man who is in charge of the particular shift; there are three shifts. * * *

And on page 24:

Q. Is there anything about these moisture testers which makes them especially adaptable for special flour mills or industrial establishments?—A. * * * They were designed for the purpose of taking moisture control out of the control of the chemists because the chemists are highly-paid men and have other things to do more important, and the particular point we make with that apparatus is that a highly-trained man don't have to operate this apparatus.

And on page 29:

Q. And, according to your experience, who uses those mills? Where are they used?—A. They are used by flour millers primarily.

And on page 31:

Q. Is there anything about this particular machinery to show its use for the laboratory or not in the laboratory?—A. No. Incidentally, only a certain percentage of the flour mills in this country have laboratories. A laboratory is not essential to a flour mill, but to ascertain the type of blend a miller wants to make is essential to a flour mill.

And on page 33:

Q. Does it perform the same function as a large mill which grinds wheat into flour?—A. Yes, sir.

   *         *         *         *         *         *         *

By Judge DALLINGER.

Q. It could be used anywhere?—A. Oh, yes, or in the laboratory. * * *

By Mr. TOMPKINS.

Q. It can be used anywhere for grinding wheat into flour?—A. Yes; in fact a small baker can buy this and grind flour.

    *     *     *     *     *     *     *

In our opinion, it plainly appears from the record that both the moisture testers and the so-called flour mills can be used by anybody in flour mills, and do not require any specially trained operators or technicians, and that they are not chiefly used in laboratories.

Upon the entire record we find the following facts:

1. The so-called moisture testers represented by illustrative exhibit A contain as an essential feature an electric oven, and are not chiefly used in laboratories.

2. The so-called flour mills represented by illustrative exhibits B–1 and B–2, although operated after importation by American-made electric motors, may be operated by other power than electricity simply by the installation of a small pulley. There is no evidence that they are chiefly used in laboratories.

3. The so-called extensographs represented by illustrative exhibit C contain two electric motors inside of the machines, and are chiefly used in laboratories by chemists or their assistants, one of the machines being used in the University of Minnesota and another in a Government laboratory at Ottawa, Canada.

4. The so-called farinographs represented by illustrative exhibit D contain several electric motors inside of the machines when imported and are used chiefly in commercial laboratories.

5. The so-called amylographs represented by illustrative exhibit E contain no electrical elements and are not chiefly used in laboratories.

6. The so-called plastographs represented by illustrative exhibit F are similar in construction to the farinographs (having several electric motors inside the machines as imported) and are chiefly used in commercial laboratories.

Upon this record counsel for the plaintiffs contend that all of the merchandise herein, except the so-called flour mills, is properly dutiable at the rate of 35 per centum ad valorem under paragraph 353 of the Tariff Act of 1930 as articles having as an essential feature an electrical element or device; and that said flour mills are properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said act as machines not specially provided for. On the other hand, counsel for the Government contends that all of said merchandise is properly dutiable at the rate of 40 per centum ad valorem under paragraph 360 of said act as laboratory instruments or parts thereof as classified by the collector.

The language of paragraph 360 of the Tariff Act of 1922, which, save for the elimination of the word "Philosophical" has been literally reenacted in the present paragraph 360, was interpreted by the United States Court of Customs and Patent Appeals in the case of W. L.

*Conover* v. *United States,* 17 C. C. P. A. 324, T. D. 43743. In that case the court said:

Paragraph 360 provides for "Philosophical, scientific, and laboratory instruments, apparatus, utensils, appliances (including drawing, surveying, and mathematical instruments), and parts thereof  *  *  *."

It will be observed that the Congress deemed it necessary to enumerate drawing, surveying and ´mathematical instruments, which would indicate that it thought they would not be covered by the language "Philosophical, scientific, and laboratory instruments, apparatus, utensils," and "Appliances." If drawing, surveying, and mathematical instruments are not included within the general terms of the paragraph it must be because those terms were intended to be limited to such instruments, etc., as were used in pure, rather than applied, science. Furthermore, if the term "scientific," as used in paragraph 218, *supra,* means of, pertaining to, or used in, science (and we so held in the *Hempstead* and *Chesterton* cases, *supra*), we can see no reason for giving the term "scientific," in paragraph 360, extended application. We are of opinion, therefore, that the term "scientific," in paragraph 360, was intended by the Congress to be limited, except as otherwise specially provided therein, to instruments, apparatus, utensils, and appliances used in pure, as distinguished from applied, science.

\*        \*        \*        \*        \*        \*        \*

This court ought not, and will not, infer that these instruments are substantially reliable and therefore practical instruments for commercial purposes from testimony to the effect that they have been used to a limited extent over a short period of time by two oil companies.  *  *  *  Surely, if the involved articles are not to be classified as scientific instruments, it must be shown, at least, that they are not devoted exclusively to matters pertaining to pure science, but are successfully, not experimentally, and substantially used in ordinary commercial pursuits.

In the case of *United States* v. *Adlanco Industrial Products Corp.,* 21 C. C. P. A. 249, T. D. 46778, certain thermoflux machines used by the medical profession and by physiotherapists in hospitals and in clinics in orthopedic treatment, and which were classified by the collector as laboratory apparatus under paragraph 360 of the Tariff Act of 1930, were held not to be dutiable under said paragraph for the reason that they were "not used in pure science, but only for practical purposes in applied science."

In the case of *United States* v. *Pyrometer Instrument Co.,* 21 C. C. P. A. 376, T. D. 46910, also arising under the Tariff Act of 1930, certain optical instruments used for detecting the temperature of hot and molten steel and iron were held not to be within the scope of paragraph 360 because not used in pure as distinguished from applied science.

On the other hand, in the case of *United States* v. *C. H. Stoelting Co.,* 21 C. C. P. A. 588, T. D. 46995, so-called chronoscopes, which were used only in connection with other apparatus in research work in laboratories and universities, were held to be scientific instruments within the scope of paragraph 360 of the Tariff Act of 1930.

So, also, in the case of *United States* v. *Arthur H. Thomas Co.,* 22 C. C. P. A. 120, T. D. 47105, certain microphotometers, which were

used exclusively for pure scientific investigational purposes, were held to be properly within the scope of said paragraph 360.

In the case of *Dr. E. C. Ernst et al.* v. *United States*, T. D. 46206, 63 Treas. Dec. 377, this court in holding certain tubes for X-ray machines to be excluded from the provision in paragraph 360 said:

Upon all the testimony we find the following facts:

(1) That the tubes and holders constituting the imported merchandise are essential parts of so-called X-ray machines.

(2) That such X-ray machines are chiefly used by doctors and dentists in the ordinary practice of their professions as an invaluable aid in the diagnosis of disease.

(3) That in many so-called "laboratories" such X-ray machines are operated by persons possessing no scientific education, the results being reported by them to physicians and dentists for their subsequent diagnosis.

(4) That the use of such X-ray machines in manufacturing industry is increasing.

(5) That the use of such X-ray machines in laboratories for purposes of scientific research is insignificant as compared with their use in the practice of medicine and dentistry and in industry.

\*　　\*　　\*　　\*　　\*　　\*　　\*

In the present case it has been shown not only that the so-called X-ray machines of which the imported merchandise are parts are "not devoted exclusively to matters pertaining to pure science" but that, on the contrary, they are chiefly used in ordinary professional and commercial pursuits; and further, that they are "successfully, not experimentally, and substantially used" in said pursuits. Accordingly, they are plainly *not* dutiable as "scientific" intruments or apparatus under paragraph 360 as classified by the collector.

In none of the cited cases was the issue raised between the meaning of the words "scientific" and "laboratory" instruments. In the more recent case of *Arthur H. Thomas Co.* v. *United States*, T. D. 49102, 72 Treas. Dec. 203, this issue was raised, and this court held certain electric incubators chiefly used in commercial laboratories, although not used in pure science, to be properly dutiable at the rate of 40 per centum ad valorem under paragraph 360 of the Tariff Act of 1930 as *laboratory* instruments, rather than at the rate of 35 per centum ad valorem under paragraph 353 of said act as articles having as an essential feature an electrical element or device. In that decision we said:

The question to be here determined is whether the present incubators are not properly classifiable as *laboratory* instruments within the meaning of said paragraph 360. We think they are. It will be observed that the two terms, scientific and laboratory, are separate and distinct, and involve two different classes of instruments. We are satisfied that the decision in *Conover* v. *United States, supra,* was intended to cover only the first class of instruments, to wit, *scientific* instruments, that is, such instruments as are used exclusively in pure, as distinguished from applied science. As we construe that decision the rule there enunciated was not intended to apply to the rest of the paragraph.

This is borne out by the fact that the Congress, in the same paragraph, has made provision for *surveying* and *mathematical* instruments. These of course are not used exclusively in pure science, but, on the contrary, are devoted largely,

if not exclusively, to commercial pursuits. Clearly, then, the *Conover* decision does not apply to such instruments, and by the same token it has no possible application to laboratory instruments, as such, but only to the particular kind of laboratory instruments which may be used exclusively in pure, as distinguished from applied, science. The classification of such laboratory instruments is governed by the fact that they are used in pure science, which determines their tariff status as scientific instruments. In other words, the term *scientific* is interpreted as applying to the kind of use made of the article. The term *laboratory* on the other hand is construed according to the place where it is chiefly used.

According to the uncontradicted evidence in the instant case, the present Hearson electric incubators are used in commercial laboratories for various purposes and they are not employed exclusively or even chiefly in pure, as distinguished from applied, science. They therefore do not come within the classification of scientific instruments but do come within the classification of laboratory instruments in said paragraph 360.

While it is also established by the uncontradicted testimony that these incubators have, as an essential feature thereof, an electrical element or device, nevertheless, the specific and *eo nomine* provision for laboratory instruments takes precedence over the provision in paragraph 353 for "articles having as an essential feature an electrical element or device." * * *

Upon the established facts and the law applicable thereto, we hold, following the last-cited case of *Arthur H. Thomas Co.* v. *United States:*

1. That the so-called moisture testers are properly dutiable at the rate of 35 per centum ad valorem under said paragraph 353 as articles having as an essential feature an electrical element or device, as alleged by the plaintiffs.

2. That the so-called flour mills and amylographs are properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said act as machines or parts thereof not specially provided for, as alleged by the plaintiffs. *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537.

3. That the so-called extensographs, farinographs, and plastographs are properly dutiable at the rate of 40 per centum ad valorem under paragraph 360 of said act as laboratory instruments, as classified by the collector.

The above claims of the plaintiffs alleged under said paragraphs 353 and 372 are therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.