(C. D. 1477)

DAVIES TURNER & Co.⎤
NIRO CORP. ⎦ *v.* UNITED STATES

United States Customs Court, Second Division

(Decided November 25, 1952)

*Sharretts, Hillis & Paley* (*Howard C. Carter* of counsel) for the plaintiffs.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard H. Welsh* and *Arthur R. Martoccia*, special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation from Denmark, described on the consular invoice as "1 complete NIRO laboratory Spray Drying Unit," was classified by the collector of customs as "laboratory apparatus" within the provisions of paragraph 360 of the Tariff Act of 1930 (19 U. S. C. §1001, par 360), and duty was assessed thereon at the rate of 40 per centum ad valorem.

It is contended alternatively by plaintiffs that the apparatus should properly have been classified as a machine, not specially provided for, within the scope of paragraph 372 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 372), as modified by the General Agreement on Tariffs and Trade (82 Treas. Dec. 305, T. D. 51802), and duty assessed thereon at the rate of 15 per centum ad valorem, or should have been classified as an article having as an essential feature an electrical element or device, within the provision of paragraph 353 of said act (19 U. S. C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade, *supra*, and likewise dutiable at the rate of 15 per centum ad valorem.

The pertinent language of the various provisions referred to above is here set forth:

Paragraph 360, Tariff Act of 1930:

Scientific and laboratory instruments, apparatus, utensils, appliances (including surveying and mathematical instruments), and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specially provided for, 40 per centum ad valorem; * * *.

Paragraph 372, Tariff Act of 1930, as modified, *supra*:

Machines, finished or unfinished, not specially provided for:

\* \* \* \* \* \* \*

Other (except wrapping and packaging machines; food grinding or cutting machines; machines for determining the strength of materials or articles in tension, compression, torsion, or shear; machines for making paper pulp or

paper; machines for manufacturing chocolate or confectionery; and internal-combustion engines)_____ 15% ad val.

Paragraph 353, Tariff Act of 1930, as modified, *supra*:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\* \* \* \* \* \* \*

Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines)_____ 15% ad val.

When this case was called for trial, one witness, Haagen Bach Nielsen, testified on behalf of the plaintiffs. Nielsen stated that he is an American engineer associated with two companies, the Nichols Engineering and Research Corp. and the Niro Corp., and has been connected with the Nichols Corp. since May 1, 1950, when that concern took over the American rights for the Niro Corp. He is employed as head of the spray drying division of the Nichols Corp. and is also a vice president of the Niro Corp., with which he has been associated since it was established in 1947. Furthermore, he is in charge of the importations from the associated company in Denmark and takes care of sales of the equipment to the sole representative of the organization, Nichols Engineering.

Nielsen stated that he is familiar with the merchandise, the subject of this controversy, and that it is a small-scale spray dryer, which is commonly referred to as a laboratory spray dryer. At this point, a 4-page printed sheet was received in evidence as plaintiffs' exhibit 1. The witness stated that the picture shown on the front page of said exhibit represents the importation in issue and that page 2 of said exhibit depicts a flow diagram of the unit, with reference to which he gave the following brief description of the construction and operation of the apparatus:

The device consists of mainly of a drying chamber on top of which is a so-called atomizer. This atomizer is a device which spins at a very high revolution—50,000 R. P. M., and by means of the centrifugal force, a liquid material introduced into this atomizer will be introduced as a fine mist; very fine droplets. When that mist is in the drying chamber, it meets a mass of hot air that enters through a duct in the center of the drying chamber. The hot air will instantaneously evaporate the water or other liquid and the solids in the feed to the atomizer will drop down to the bottom of the drying chamber from where it is removed as a finished product. The exhaust air will carry the evaporated water out to the atmosphere and the powder will be carried along with that exhaust air until a cyclone device which separates the powder from the air permits the air to go out to the atmosphere, but keeping back the powder in a so-called collecting glass.

On being asked what methods are used for heating this air, Nielsen replied:

The unit is equipped with two different heaters—either one can be used. One is a direct-fired gas heater where the combustion of the gas is passed through the drying chamber; another one is an electric heater, where the heating is done by indirect contact between the heating elements and the air passing through the heater. This means of heating makes it possible to pass hot air into the drying chamber without having any combustion from the heating.

The witness stated that the electrical heating unit is absolutely necessary if one is drying a material which is not soluble in water or if one is drying products sensitive to matter from the combustion exhaust. He stated also that the exhaust blower is motivated by an electric motor.

Nielsen testified that no special study is required in order to operate the imported device and that when one of these units is sold he goes to the plant and in about an hour is able to teach the man who is to operate the unit. The particular device in controversy was sold to the Robson Process Co. and, after installation, Nielsen had seen it on the ground floor in the company's plant in Pennsylvania. He stated that it was not installed in the laboratory. When he had seen the machine used, it was operated by an ordinary plant employee, and was being employed for drying tanning extract for the preparation of sole leather.

Nielsen stated that in the past his company had imported a total of four of these machines. One of the units was sold to the American Maize Products Co. located in Roby, Ind. He had seen it after installation and stated that it was in a special building called the pilot plant and that it was not installed in the laboratory.

Another of the mechanisms was sold to Arnold Hoffman and Co. and was installed in that company's plant in Massachusetts. Nielsen stated that the fourth imported drying machine was installed at Nichols Engineering and Research Corp.'s own premises where it is being used on and off for demonstration purposes. He testified that the majority of the units are used in the plant for processing and for development work, being controlled by the ordinary operating personnel.

On being subjected to cross-examination, Nielsen stated that the function of this imported spray dryer is for "drying off suspensions or solutions converting those materials into a dried material in powder form." He added that the device is rarely used on a large-scale quantity basis in a commercial way in the manufacturing of those products because the spray drier's unit capacity is very small; that "It is a production unit for expensive materials like pharmaceuticals where you have a very small production requirement. For other more common material, the materials, the unit is a pilot plant and functions as such." When asked what he meant by a pilot plant, the witness replied:

By a pilot plant I mean a unit on which you do experimental and development work. You may, for instance, want to consider drying a certain product, but you do not know whether that product is a product the public will buy. It is, therefore, before you invest $100,000 in a large production plant, you do experimental work on a small unit of $3,000, make up say 20 or 25 pounds of material and send it out for customer reaction.

Nielsen stated that the imported spray drier is chiefly used for experimental purposes and that this is true of the other spray driers, previously referred to, with the exception of the one installed at Nichols Engineering which is used for demonstrations. The one at the Robson Process Co. is on the ground floor "in the main plant where they have all their heavy industrial equipment" and, although it is employed for experimental purposes, it was not placed in the laboratory. Nielsen stated that the device has moving parts, consisting of a main shaft and a wheel. He described the operation of the atomizer as follows:

On the main shaft is mounted a reaction turbine wheel by forcing compressed air through that atomizer and applying the compressed air on the reaction turbine wheel, you make the wheel and the shaft and the atomizer wheel spin.

Upon redirect examination, Nielsen stated that he differentiates between experimental work and research work and also between the terms, "applied science" and "pure science," and added that research and pure science are practically the same thing.

In answer to a question by the court, the witness stated that the electric motor which operates the machine in controversy is built into the mechanism and that it is concealed by the instrument panel on the page marked "A" of plaintiffs' exhibit 1. He added that although he had stated that the motor might be replaced by steam power, it would "definitely not" be practical to do so—"theoretically it could be done but I can't see how it could be done practically or done at all."

The provision for laboratory instruments contained in paragraph 360, supra, was involved in a decision by this court in Arthur H. Thomas Co. v. United States, 72 Treas. Dec. 203, T. D. 49102, promulgated July 19, 1937, where the proper classification of certain Hearson electric incubators was in controversy. The classification and the alternative claims in that case are the same as those involved herein, although the rates of duty applicable to the claimed provisions have been reduced by the General Agreement on Tariffs and Trade. The court in the Thomas case, supra, found that the electric incubators there involved were used in commercial laboratories for various purposes and were not employed exclusively or even chiefly in pure, as distinguished from applied, science, and sustained the collector's classification as "laboratory instruments." In arriving at that conclusion, the court stated—

The question to be here determined is whether the present incubators are not properly classifiable as *laboratory* instruments within the meaning of said paragraph 360. We think they are. It will be observed that the two terms, scientific and laboratory, are separate and distinct, and involve two different classes of instruments. We are satisfied that the decision in *Conover* v. *United States, supra*, was intended to cover only the first class of instruments, to wit, *scientific* instruments, that is, such instruments as are used exclusively in pure, as distinguished from applied science. As we construe that decision the rule there enunciated was not intended to apply to the rest of the paragraph.

This is borne out by the fact that the Congress, in the same paragraph, has made provision for *surveying* and *mathematical* instruments. These of course are not used exclusively in pure science, but, on the contrary, are devoted largely, if not exclusively, to commercial pursuits. Clearly, then, the *Conover* decision does not apply to such instruments, and by the same token it has no possible application to laboratory instruments, as such, but only to the particular kind of laboratory instruments which may be used exclusively in pure, as distinguished from applied, science. The classification of such laboratory instruments is governed by the fact that they are used in pure science, which determines their tariff status as scientific instruments. In other words, the term *scientific* is interpreted as applying to the kind of use made of the article. The term *laboratory* on the other hand is construed according to the place where it is chiefly used. [Italics quoted.]

There was no appeal from the decision in the *Thomas* case, *supra*, and it has been cited and applied in the following instances: *Brabender Corp. et al.* v. *United States*, 6 Cust. Ct. 331, C. D. 491; *Cambosco Scientific Co.* v. *United States*, 8 Cust. Ct. 191, C. D. 601; and *Brabender Corp. et al.* v. *United States*, 8 Cust. Ct. 267, C. D. 619.

It would appear from the record before us that the spray drying unit in controversy was not used in pure science but was "devoted largely, if not exclusively, to commercial pursuits." It also appears that the spray drying unit was "installed on the ground floor in the main plant"; that it was not installed in the laboratory; and that it did not require a technician for its operation.

It is clear, therefore, that plaintiffs have presented a *prima facie* case and that the presumption of correctness attaching to the collector's classification has been overcome.

It is disclosed by the record that the machine in issue is operated by an electric motor built into the mechanism and that it would not be practicable to replace the motor by other means of functioning. It is evident, therefore, that the mechanism in controversy comes within the provisions of said paragraph 353, *supra*. *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050, and *Ralph C. Coxhead Corp.* v. *United States*, 22 C. C. P. A. (Customs) 96, T. D. 47080.

Paragraph 353 of the Tariff Act of 1930, as modified, *supra*, providing for "articles having as an essential feature an electrical element or device, such as electric motors, * * * " at 15 per centum ad valorem is a more specific provision than the one for other "Machines,

254

finished or unfinished, not specially provided for," in paragraph 372 of said act, as modified, providing a like rate of duty, and is the proper classification to be applied to the article in controversy.

Upon the authorities cited, we are constrained to hold that the imported article is not "laboratory apparatus," as judicially construed, and that the claim of plaintiffs for classification within the provisions of paragraph 353, as modified, *supra*, must be sustained. All other claims are overruled.

Judgment will be entered accordingly.