(C. D. 1720)

FEDERAL ELECTRIC PRODUCTS CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 21, 1955)

*John D. Rode* for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Alfred A. Taylor, Jr.*, trial attorney), for the defendant.

Lawrence, Judge: An importation referred to in the record as high-tension apparatus or circuit breaker was classified by the collector of customs as laboratory apparatus pursuant to the provisions of paragraph 360 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 360), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade (86 Treas. Dec. 121, T. D. 52739), supplemented by Presidential proclamation (86 Treas. Dec. 337, T. D. 52820), and duty was assessed accordingly at the rate of 30 per centum ad valorem.

Plaintiff, by its protest, makes various claims for lower rates of duty but relies upon the claim that the merchandise is properly dutiable at 17½ per centum ad valorem in accordance with the provisions of paragraph 353 of said act (19 U. S. C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade (82 Treas. Dec. 305, T. D. 51802), as "Articles suitable for * * * controlling * * * electrical energy * * *: Switches and switchgear which are not wiring apparatus."

The pertinent text of the statutes is here set forth—

Paragraph 360 of the Tariff Act of 1930, as modified, *supra*:

Scientific and laboratory instruments, apparatus, utensils, appliances (including mathematical instruments, but not including surveying instruments), and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfihished, not specially provided for:

* * * * * * *

Other (except laboratory instruments, apparatus, or appliances, for determining the strength of materials or articles in tension, compression, torsion, or shear; moisture testers; pyrometers; and parts of any of the foregoing) _____ 30% ad val.

Paragraph 353 of said act, as modified, *supra*:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

Switches and switchgear which are not wiring apparatus, instruments, or devices; fans; blowers; and washing machines_____ 17½% ad val.

The question presented for our determination is stated by plaintiff in its brief as follows:

Is the merchandise scientific or laboratory apparatus, or is it an article suitable for controlling electrical energy—a switch or switchgear not wiring apparatus?

The only witness in the case, Wallace Driver, was called by the plaintiff.

Driver testified that he has been associated with the Federal Electric Products Co., plaintiff, for the past 7 years and is in charge of the test laboratory and assistant to the director of research and development. His company is engaged in the manufacture of electrical control apparatus, switchgear, panel boards, safety switches, and general types of electrical control. He testified to his familiarity with the imported item and described it as a circuit breaker that is used for the control of high-voltage motors; that it could be used for other purposes such as controlling branch circuits, but it has all the apparatus on it necessary to control a motor; that it is a large piece of equipment, being about 4 or 5 feet wide, 7 feet high, and 6 feet deep. He stated further that the item was imported for the purpose of determining whether the plaintiff would be able to either manufacture it or supply it as an imported article in conjunction with various apparatus that his company sells; that it controls or regulates electrical energy by actually closing contacts and permitting electrical energy to flow into a motor or branch circuit, or opening the circuit and stopping the motor, or de-energizing the branch circuit.

In describing the use of the device, Driver stated that the only uses known to him were for controlling a large motor or controlling a branch circuit; that it has the facility of being a circuit breaker as well as a motor control.

When asked if the article was used in laboratory work, the witness replied—

No, I couldn't think of a laboratory instrument that would be big enough that would be worthwhile for this to control. In our laboratory, let's say, or any of our line of business, we would not use it for any laboratory work.

the reason being that—

* * * it's designed specifically for opening these large motors that are used for big rolling mills or air compressors. And all of our laboratory apparatus, let's say, consists of small d. c. generators, for instance, or instruments of various sorts, measuring devices. This is not primarily a measuring device.

Driver was then interrogated as to his familiarity with the term "switchgear." He stated that his company manufactures "switches" and that the subject instrument could be a component of switchgear; that the term "switchgear" is loosely used to cover switchboards and the equipment that is used inside the boards; that the imported apparatus is used to break an electrical circuit; and that a circuit breaker is a form of switchgear. When asked if he calls the apparatus a circuit breaker, Driver replied "It's a draw-out circuit breaker set up for use as a motor control." He testified also that it is not a wiring device of any kind.

It seems clear from the record before us that the imported article in controversy is not intended for use in laboratories but rather in

factories for the purpose of starting, stopping, and controlling large motors and that it is an article suitable for controlling electrical energy.

Plaintiff contends, first, that the imported apparatus, being designed for use in commercial pursuits, such as opening large motors in utility companies, or in air compressors, is not, therefore, used in pure science nor in laboratory operations and, hence, cannot properly be classified in paragraph 360 of the tariff act, *supra*, citing *W. L. Conover* v. *United States*, 17 C. C. P. A. (Customs) 324, T. D. 43743, and *Davies Turner & Co.* v. *United States*, 29 Cust. Ct. 248, C. D. 1477.

In the *Conover* case, *supra*, our appellate court held that the term "scientific," as used in paragraph 360 of the Tariff Act of 1922, which was repeated in substantially the same context in paragraph 360 of the Tariff Act of 1930, was intended by Congress to be limited, except as otherwise specially indicated therein, to instruments, apparatus, utensils, and appliances, used in pure, as distinguished from applied, science.

Further, the court held that certain seismographs, constructed on a smaller scale than those used in laboratories and differing therefrom in no other material respect, were, upon the record before it, scientific instruments, it not appearing that said seismographs were used successfully and substantially in ordinary commercial pursuits.

In the *Davies Turner* case, *supra*, this court held that a so-called Niro spray drying unit, an electrical device, consisting of a drying oven on top of which rests an atomizer capable of spinning at 50,000 R. P. M., employed in engineering and processing plants for experimental and development work, and not being used in laboratories nor in pure science, as distinguished from applied science, was not "laboratory apparatus," as that term is used in paragraph 360 of the Tariff Act of 1930.

It is suggested by plaintiff in its brief that classification herein by the collector of customs may have resulted from a misunderstanding of the intended use by the importer of the apparatus in issue, and reference is made to exhibit 1—a letter addressed to the appraiser's office at New York by the plaintiff company—which states in part—

We wish to advise you that this equipment is to be used in our laboratory strictly for research purposes and will not be used commercially.

It appears from the testimony of Driver that the particular instrument was not imported for sale but for the purpose of testing and examination to determine if it was suitable for manufacture here for use in conjunction with other instruments being sold by the importer and that the apparatus itself was not to be used for research purposes.

Plaintiff concludes its argument by insisting that, since the imported instrument is used to break the current on a large motor, it is essentially a switch or switchgear "which regulates electrical energy by closing contacts and permitting electrical energy to flow into a motor or circuit," it being used particularly on large electric motors in commercial establishments for breaking the electrical circuit; that it is definitely not a wiring apparatus of any kind but a "draw-out" circuit breaker.

We are satisfied that the apparatus in controversy does not come within the provision for laboratory apparatus in paragraph 360 of the Tariff Act of 1930, as modified, *supra.*

Our attention has not been invited to any judicial or other authorities which give expression to the meaning of the words "Switches and switchgear which are not wiring apparatus." However, we are aided in arriving at the meaning of the terms "switch" and "switchgear" by reference to the following lexicographic authorities:

Webster's New International Dictionary, 1950 edition:

**switchgear,** *n.* * * * *Elec.* The mechanism used to operate large switches.

**switch,** *n.* * * * **5.** *Elec.* A device for making, breaking, or changing the connections in an electric circuit.

This is followed by several graphic illustrations and definitions of different types of switches.

Funk & Wagnalls New Standard Dictionary of the English Language, 1942 edition:

**switch,** *n.* **1.** * * * Electric switches are sometimes named (1) from their operation, or the purpose they serve; as, **changing switch** (changing a circuit from one source to another), * * *. **S.-gear,** *n.* The mechanism that works a switch, especially of a railway-switch.

In harmony with the foregoing definitions of "switch" and "switchgear," which conform to the court's understanding of those terms, we are of the opinion upon the undisputed evidence presented that the apparatus in controversy is of the class of "Switches and switchgear which are not wiring apparatus" within the meaning of that phrase in paragraph 353 of said act, as modified, *supra.*

Filed with the record herein is a notice from the office of the defendant addressed to the court stating—

* * * upon consideration of the record made and the brief filed by counsel for the plaintiff, this office does not desire to file a brief on behalf of the United States in the above entitled case.

Upon the record and for the foregoing reasons, we sustain the claim of plaintiff that the merchandise herein should be classified as "Articles suitable for * * * controlling * * * electrical energy," namely, "Switches and switchgear which are not wiring apparatus, instruments,

or devices" and subjected to duty at the rate of 17½ per centum ad valorem in paragraph 353 of the Tariff Act of 1930, as modified, *supra*. All other claims are overruled.

Judgment will issue accordingly.