**NEW YORK MERCHANDISE CO., Inc.**

v.

**UNITED STATES.**

C.D. 3150; Protest 63/19549–448.

United States Customs Court,
Second Division.

Oct. 9, 1967.

Stein & Shostak, Los Angeles, Cal. (Marjorie M. Shostak, S. Richard Shostak, Los Angeles, Cal., and Leonard M. Futman of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Harold L. Grossman, Sheila N. Ziff, and Brian S. Goldstein, trial attys.), New York City, for defendant.

Before RAO, FORD, and BECKWORTH, Judges.

BECKWORTH, Judge:

The merchandise involved in this case consists of brass switch plates or shields imported from Japan and entered at the port of San Diego on October 29, 1962. They were assessed with duty at 17½ per centum ad valorem under paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739, as electrical

wiring devices. It is claimed that they are properly dutiable at 11 per centum ad valorem under paragraph 339 of said tariff act, as modified by Presidential proclamations, 97 Treas.Dec. 157, T.D. 55615, and 98 Treas.Dec., 51 T.D. 55816, as household utensils of brass, or, alternatively, at 17 per centum ad valorem under paragraph 397 of said tariff act, as modified by T.D. 55615 and T.D. 55816, as articles of brass, not specially provided for. The Government has made an alternative contention for classification as parts of switches at 17½ per centum ad valorem under said paragraph 353, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802.

The pertinent provisions of said tariff act, as modified, are as follows:

Paragraph 339, as modified by T.D. 55619 and T.D. 55816:

Electrical wiring apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for ............................... 17½% ad val.

\* \* \* \* \* \* \* \*

Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part (not including X-ray tubes or parts thereof) ............... The same rate of duty as the articles of which they are parts.

Paragraph 339, as modified by T.D. 55615 and T.D. 55816:

Table, household, kitchen, and hospital utensils, and hollow or flat ware, not specially provided for, whether or not containing electrical heating elements as constituent parts:

\* \* \* \* \* \* \* \*

Not plated with platinum, gold, or silver, and not specially provided for, composed wholly or in chief value of—

Brass ................................. 11% ad val.

Paragraph 397, as modified by T.D. 55615 and T.D. 55816:

Articles or wares not specially provided for, partly or wholly manufactured, not plated with platinum, gold, or silver, and not colored with gold lacquer:

\* \* \* \* \* \* \* \*

Composed wholly or in chief value of iron, steel, copper, brass, \* \* \*:

\* \* \* \* \* \* \* \*

Composed wholly or in chief value of brass \* \* \* ..................... 17% ad val.

Paragraph 353, as modified by T.D. 51802:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or un-

finished, wholly or in chief value of metal, and not specially provided for:

| | |
|---|---|
| Switches and switchgear which are not wiring apparatus, instruments, or devices; fans; blowers; and washing machines ........... | 17½% ad val. |
| * * * * * * * * | |
| Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part ............ | The same rate of duty as the articles of which they are parts. |

---

At the trial, representative samples of the merchandise were received in evidence as collective exhibit 1. They consist of decorative brass plates of the type used on walls to cover electric switches. It was stipulated that they were in chief value of brass.

Plaintiff's first witness was Sidney L. Friedlander. He stated that he had a bachelor of science degree in electrical engineering from the University of California at Los Angeles, and that he had worked in the engineering field for about 13 years, first with General Electric Company, then for Hughes Aircraft and later with Davis Products, Inc. He is presently in the premium and sales promotion field. He had received college training relative to switches, switchgears, and wiring, and during his employment at Davis Products had designed and built electrical heating equipment and supervised work with electricians and electrical engineers in plant design, including wire layout and switches. He had worked with industrial and heating equipment, including motors and air and electrically operated mechanical presses, and had worked with heat-sealing equipment.

He testified that a switch is a device which interrupts the flow of electrical current. It consists of contact points for attaching wires and a movable arm of some type which is generally operated by mechanical means. He was familiar with switchplates and switchplate covers and said that they had no function in the operation of a switch. They are primarily a safety device and a decorative device and must be fire resistant. The reason for this is there is always the possibility of any electrical circuit sparking or arcing or something catching on fire. Switchplates have to meet the fire code. They are not connected to wires but are affixed to the switch casing through the use of screws. In his view, they are not part of the switch or switching apparatus because they have no connection with it.

He was familiar with a type of installation of switches without switch covers, principally industrial equipment, such as electrical testing equipment, "diaelectric" heating equipment, and other equipment of a portable or semi-portable nature. He had seen such equipment without switchplates at Davis Products and at trade shows. He also stated that a switch could be used without switchplates in a low voltage application, such as doorbells. Standard circuit breakers outside the average home do not have switchplates. They just have a contact in the box.

The plaintiff's second witness was Sam Luftig, a buyer for the New York Merchandise Company. He had been with the company for 31 years and for 18 years was in the department handling household goods, hardware, sundries, leather goods, gift items, and brassware. His company imports brass switchplates and he has personally handled sales of these items. His company also has an electrical department but he did not think

that it handled switches. His firm sells switchplates in the brass and gift department and not in the electrical department. He has sold brass switchplates to stores, by mail order to jobbers who sell gift items, to gift stores and home furnishing places. He mentioned Acme Hardware, Builders Emporium, Exclusive Products, and the May Company. He had seen them displayed at Acme Hardware in the decorator department and at the May Company in a sort of gift section. He had seen these items in actual use in his own home and in the homes of friends and relatives. When he moved, he had taken them out of the house to the new house and he had known of other people doing the same.

Defendant called William R. Rivers, a market development specialist and salesman for the General Electric Company, representing the wiring and device department. He had been with the company since 1930 and during all of those years had sold and worked in the wire device sales department. He had represented General Electric in the sale of devices in every part of the country except the Northwest. The types of wiring devices sold by his department include switches, outlets, cord sets, and switchplates. His company sells to electrical distributors but, in doing so, has to contact engineers, architects, dealers, electrical contractors, industrial concerns, and utilities, in order to influence the sale of goods to and through their distributors. His company has a catalog relating to the wiring devices which it manufactures and sells. A copy of this was received in evidence as defendant's exhibit A.

While the witness was not familiar with the particular switchplates involved herein, he stated that plates generally of this decorative brass style were on display in the electrical departments of many dealers' stores, and that his company manufactures similar items. He was shown a sheet describing a line of decorator wallplates sold by his company (defendant's exhibit B) and stated that they were primarily put on the market to decorate homes but that they were also sold and used in industrial and commercial buildings. His firm did not sell them any place where it did not sell switches. A marketing effort to sell them elsewhere fell fairly flat. His firm was unable to get much distribution through decorator shops; the only successful outlets were through electrical dealers or on electrical counters in Woolworth's and other stores.

Mr. Rivers testified that these plates do not have wires nor movable features. He said that a switch would work without a switchplate but that it could not be safely used without one. He knew of machines which did not have switchplates but in such cases the housing of the machine provides protection around the immediate area of the switch and only the handle sticks through the machine.

Mr. Rivers belongs to the International Association of Electrical Inspectors whose purpose is the dissemination of information with respect to codes of electrical safety and the recommendation of changes or revisions of the national electrical code on which most other electrical codes of the nation are based. The purpose of the code is to provide safe material safely installed. His association is concerned with plates and wants a plate of a certain thickness as well as one of inflammable material, so that it cannot become broken or distorted. He explained that, if a flimsy type of plate were installed, and were broken by a child, it would be possible for a child to get his hand in and touch some of the hot wires. His firm sells electrical wiring devices and switchplates to cover the electrical wiring. In view of his years of experience, Mr. Rivers stated that the purpose of a switchplate is to provide safety for an electrical outlet or switch and at the same time add a decorative touch to the installation. He considered it essential in order to enable an inhabitant of a structure to switch a light on and off with some degree of safety.

On the basis of his familiarity with the trade, he regarded switchplates to be wiring devices because they perform the

same functions as other wiring devices illustrated in his company's wiring device catalog for covering up switchboxes with switches installed, or outlet boxes without the outlet installed. He considered them to be wiring devices regardless of their decorative feature and said they had been in his firm's catalog of wiring devices since he began handling them in 1930.

He testified that he had sold switchplates as wiring devices and that General Electric so marketed them throughout the country. He knew of his own knowledge that electrical contractors and subcontractors ordinarily supply switchplates as part of their contracts. He explained that all contractors who contract to wire a school or public building, or any other building, do not consider their contract complete until there has been a satisfactory electrical inspection and approval by the municipal, county, or state authority involved, and that those authorities will not give their approval of the job unless the plates are on the wall and the switches.

Mr. Rivers testified that a switchplate is essential to the safety of the installation of a wiring device, and that it is a wiring device and more than an accessory. It is a necessary part for the safety of the building. He stated that it is a device and that the industry has chosen the term "device" to include most of the end use devices in the application of electricity in homes and offices. He said that a light bulb is not a wiring device because it is not usable without a lampholder, which is a wiring device, and that the shade that goes around the lampholder is a lighting fixture.

Defendant's exhibit A is a catalog issued by General Electric entitled "Wiring Devices." It depicts and describes such items as:

Cable Terminals
Caps, Connectors and Motor Bases
Combination Devices
Flexway Wiring System Components
Fuseholders
Heating Cable Sets and Controls
Interchangeable line devices
Lampholders
Locking Devices
Outlets
Receptacles
Remote-Control Wiring Components
Starters
Surface-line Devices
Switches
Wall Plates

The merchandise involved herein was classified as an electrical wiring device under paragraph 353 of the Tariff Act of 1930, as modified, supra. Plaintiff claims it is not so classifiable, but is a household utensil or is dutiable as an article of metal, not specially provided for.

An examination of the history of tariff provisions for electrical articles discloses that, under the Tariff Act of 1922, electrical machinery and apparatus were classified under paragraph 399 as manufactures of metal, not specially provided for. The Summary of Tariff Information, 1929, states (p. 908):

(3) *Electrical machinery and apparatus.*—Certain types of electrical machinery and apparatus, such as transformers, switches, circuit breakers, fuse choke coils, reactors, sockets, cutouts, adjustment plugs, industrial electric furnaces and ovens, therapeutic apparatus, X-ray machines, telephone apparatus, spark plugs, and other electrical apparatus and parts n.s. p.f. are included under this group.

The Tariff Act of 1930, however, contains a specific paragraph, 353, for four separate groups of electrical articles:

■ All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

■ electrical telegraph (including printing and typewriting), telephone, signaling, radio, welding, ignition, wiring, therapeutic, and X-ray apparatus, instruments (other than laboratory), and devices; and

■ articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters,

ovens, ranges, washing machines, refrigerators, and signs;

▮ all the foregoing, and parts thereof, finished or unfinished, wholly or in chief value of metal, and not specially provided for, 35 per centum ad valorem.

As noted in a recent case, Close and Stewart v. United States, 58 Cust.Ct., C.D. 2985, the reports of congressional committees at the time of the enactment of the 1930 act indicate that paragraph 353 was intended to cover electrical machinery, instruments, devices, and apparatus, such as those to which specific reference was made in the Summary of Tariff Information, supra.

The Summaries of Tariff Information, 1948, state in volume 3, part 3, page 100:

The wiring devices covered in this summary include small switches, wall outlets, lamp holders, and other small devices for distributing electricity in buildings. * * *

Large switches, not wiring devices, have been provided for in a separate provision of paragraph 353 carved out by the General Agreement on Tariffs and Trade, T.D. 51802, supra. They have been held to include mechanisms which operate large switches, devices for making, breaking, or changing circuits, and airblast circuit breakers. Federal Electric Products Co. v. United States, 35 Cust.Ct. 47, C.D. 1720; Brown Boveri Corp., Gehrig Hoban & Co., Inc. v. United States, 53 CCPA 19, C.A.D. 870.

Plaintiff relies on A. N. Khouri & Bro. v. United States, 22 CCPA 28, T.D. 47037. The merchandise there consisted of floor and base lamps, usable, after being wired and equipped with switches sockets, and bulbs, for electrical lighting. The court held that they were not the type of electrical apparatus, instruments, or devices intended to be covered by paragraph 353. It rejected the argument that, because it was essential to wire lamps of the kind involved in order to furnish light, the wire and its appurtenances were suitable for distributing

electrical energy, noting that "Electrical distributors have a well-understood meaning in the art." It also stated, "Such wires, bulbs, switches and sockets, are not the character of elements to which we think the paragraph alludes."

Subsequently, in United States v. N. Minami & Co., Inc., 29 CCPA 169, C.A.D. 188, it was held that Christmas wreaths constructed of wood-chip to which is attached a paper-covered wire cord having a socket for an electric light, with a plug at one end designed for insertion in a wall socket, were dutiable under paragraph 353 under the provision for "articles having as an essential feature an electrical element or device, such as * * * signs." In the course of its opinion, the court discussed the *Khouri* case and stated that some of the expressions there were dicta, including the last sentence quoted above.

In National Carloading Corp. v. United States, 44 CCPA 77, C.A.D. 640, the term "wiring device" was held to include push button type sockets designed to be connected to wires which supply electric current. Key type sockets have also been held to be wiring devices, particularly since they are known in the trade and designated in trade catalogs as wiring devices. Criterion Lamp & Shade Co. v. United States, 32 Cust.Ct. 58, C.D. 1580.

On the other hand, merchandise consisting not only of a socket but also of a shade and insulated rubberized cord and an arm or brace to be attached to the head of a sewing machine has been held to be a lighting fixture and not an electrical wiring device. Naumes Forwarding Service v. United States, 39 Cust.Ct. 509, Abstract 61377.

It appears from the evidence in this case that switchplates are not connected, *per se*, to wires but that they are affixed to switchcasing, and the switches, of course, are attached to the wires. The switchplates thus appear to be part of an electrical wiring installation. They are the articles or devices placed at the end of a wiring system, are necessary for the safety of the persons who activate the

switch, and are required by safety codes. They also serve the purpose of preventing tampering with the switch or the wires connected with it by a child or an adult. Contractors do not consider their electrical contracts properly carried out unless plates have been installed.

While Mr. Luftig testified that his firm sold switchplates in the brass and gift departments and that certain other stores to whom he sold displayed them in decorator or gift departments, the record does not indicate whether his experience was local or throughout the country. The stores he mentioned appear to be local.

On the other hand, Mr. Rivers testified that he had sold wiring devices, including switchplates, in every part of the country except the Northwest, and that General Electric has sold such switchplates as wiring devices since 1930. He said that General Electric sold to electrical distributors and dealers and was unsuccessful in selling switchplates through decorator shops.

■ Plaintiff's claim that these switchplates are classifiable under paragraph 339, as modified, supra, as household utensils of brass is not supported by the evidence presented. Obviously, they are used in households but there is evidence that they are also used in commercial buildings, offices, and warehouses. The evidence does not establish that even the decorator type switchplates are chiefly used in households. This claim is, therefore, overruled.

These switchplates are, of course, articles of metal, but they are not classifiable under paragraph 397, supra, as plaintiff alternatively claims, if they are specially provided for elsewhere in the tariff act.

The evidence here establishes that General Electric (one of the leading manufacturers in the United States) has sold switchplates and has listed them in its trade catalog under the general category of "wiring devices." The collector classified the merchandise as "wiring devices." It appears, however, that while switchplates are a component of a complete system of electrical wiring as installed in homes and other buildings, they are not attached to wires and thus are not *wiring* devices in themselves. They are attached to the casing of small switches which are wiring devices. Therefore, if the plates are parts of switches, they are properly classifiable under paragraph 353, as modified, supra, as parts of wiring devices.

■ In a recent case, Gallagher & Ascher Company v. United States, 52 CCPA 11, C.A.D. 849, our court of appeals held that whether a given article constitutes a part of another article depends upon the nature of the so-called part and on its function and purpose in relation to the article to which it attaches or with which it is designed to serve. The merchandise there consisted of auxiliary heaters for use in Volkswagen automobiles. After discussing many cases involving the issue of whether a given item was a "part," the court stated (p. 16):

> Here, as in *Pompeo,* the imported articles are dedicated to a sole specified use and "for no other use." Here, as in *Trans Atlantic Company,* the imported article serves a useful function. In *Trans Atlantic* the brackets mounted on the door frame were necessary to the efficient operation of the door closer. Here the record supports the view that the auxiliary heater contributed to the safe and efficient operation of the Volkswagen in frigid temperatures in relation to the comfort of its occupants and in aid of the indispensable safety factor of vision by assisting in the removal of ice from the windshield.
>
> The facts of record that the auxiliary heater was optional equipment; that the Volkswagen came equipped with a conventional heater and that the automobile could be operated without the additional heater, are not of such vital import as to be determinative of the issue. When once attached to the automobile to which it was solely dedicated and in the manner disclosed, and in the performance of the function for which it was designed, it became a

part of the automobile within the purview of paragraph 369(c) of the Tariff Act of 1930 as, modified.

In an earlier case, United States v. Bosch Magneto Co., 13 Ct.Cust.Appls. 569, T.D. 41434, it was held that lamps and horns were parts of automobiles because necessary to the proper operation of the vehicles. In affirming the decision of the Board of General Appraisers, the court said that it found no fault with that part of the board's opinion which indicated it was influenced by the fact that the law required the use of horns and lamps on automobiles. It then stated (p. 572):

> We think lamps and horns are essential and necessary parts of automobiles and that automobiles can not be efficiently, safely, or properly operated without them. Even if we were to adopt the test made in certain cited cases where, if the use is optional it is not "a part," we would not regard our views in this case as in conflict with decided cases, since it is a matter of common knowledge that the use of lamps and horns is not optional if the operator of the machine operates it in a safe, efficient, and proper manner. The machine could be operated without mud guards, without tires, and without a wind shield, and yet it is obvious that they are necessary and generally required if the machine is to be operated in its usual manner. To operate an automobile without lights would certainly limit it to day operations, and the use of a horn or some other sounding device is usually so essential to the safety of the operator of the car and to the public in general as to make its use almost indispensable.

See also Eric Wedemeyer v. United States, 7 Cust.Ct. 141, C.D. 556; Spiegel Bros. Corp. v. United States, 9 Cust.Ct. 194, C.D. 692; Border Brokerage Company, Inc. v. United States, 58 Cust.Ct. C.D. 2948.

The evidence in the instant case establishes that a switch can be operated without a switchplate, but that a plate is necessary for its operation in a safe, efficient, and proper manner under ordinary circumstances in homes and other buildings. Electrical contractors regard them as necessary to the completion of electrical wiring contracts and governmental authorities require them. Switchplates have no other use than being placed on walls to cover the switch, so that when the switch is activated, the operator's hand does not come in contact with the switch itself or the electric wiring. In addition, they prevent tampering with the wiring or the switch itself.

We hold, therefore, that switchplates are parts of switches, which are wiring devices, and are properly dutiable at 17½ per centum ad valorem under paragraph 353, as modified, supra, as parts of wiring devices. While the collector classified the wallplates as wiring devices rather than parts of wiring devices, the rate of duty is the same.

Plaintiff has suffered no injury. The protest is overruled without affirming the collector's classification. Judgment will be entered accordingly.

RAO, C. J., and FORD, J., concur.